UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:18-cv-00008-FDW-DSC

| | |
|---|---|
| MATHLON K. PULLIAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | ORDER |
| LOWE'S COMPANIES, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 13) pursuant to Fed. R. Civ. P. 56 regarding Plaintiff's claims of race discrimination in violation of 42 U.S.C. § 1981 and wrongful termination in violation of public policy under N.C. Gen. Stat. § 143-422.2. For the reasons stated below, Defendant's Motion for Summary Judgment is GRANTED.

## I. BACKGROUND

Plaintiff, an African-American male, holds both a master of science in chemical engineering and a master of business administration. Defendant Lowe's Companies, Inc. ("Lowe's") is a multinational home improvement company based in Mooresville, North Carolina. Specifically, Plaintiff alleges Lowe's Vice President Doug Jennings ("Jennings") treated him differently from his white colleagues by making an inappropriate remark and interfering with his ability to hire and manage his team. Conversely, Lowe's alleges Plaintiff's cited events were not motivated by discriminatory animus, and Lowe's ultimately terminated Plaintiff because he failed to demonstrate meaningful progress on the key initiative within Lowe's that he was hired to complete. Most significant to this Court, however, is the fact Plaintiff worked at Lowe's for less

than seven months, and he was terminated by the same person who interviewed and hired him.

In 2013, Lowe's reorganized and expanded a portion of its Finance department to create the Enterprise Measure and Evaluate Group ("Measure & Evaluate"). The new group focused on providing financial analyses and big data analytics. In early 2014, Jennings, who ran Measure & Evaluate, began recruiting for a Measure & Evaluate Director position. Jennings had previously filled two director positions by incumbent members of the former Finance department. (Jennings Decl. at 3-4). For the third director position, which was to be focused on Lowe's enterprise-wide activities, Jennings looked to external candidates. (Id. at 4). Jennings interviewed several candidates by phone for the director position, including Plaintiff, and Plaintiff was the only candidate invited for an in-person interview. (Id. at 4-5). After completing Defendant's formal interview process, Jennings hired Plaintiff to work at Defendant's corporate headquarters. While others were involved in the interview process, Jennings testified he had the final authority over whether or not to hire Plaintiff. (Jennings Dep. at 49). Plaintiff has neither presented nor forecast any evidence to contradict that testimony.

As Director of Measure & Evaluate, Plaintiff's position involved developing and implementing financial strategy. More specifically, Plaintiff's job focused on Lowe's enterprise-wide activities. (Jennings Decl. at 3). Of these responsibilities, the parties agree Plaintiff's most critical task was developing a project called Business Case Best Practices (the "Project"), which was a Measure & Evaluate team goal. (Pulliam Dep. at 67; Jennings Dep. at 141). Moreover, Jennings believed Plaintiff's previous experience working in portfolio analytics, mergers and acquisitions, and finance at several large companies, such as Polypore International and Delhaize America, would provide Plaintiff with highly relevant experience he could leverage into

completing the Project. (Jennings Decl. at 5).

The Project was initially expected to be completed by September 2014, although Jennings testified that in July or August of 2014 there were clear signs Plaintiff was significantly behind schedule. (Jennings Dep. at 123). Jennings noted he was concerned because he "wasn't seeing any traction on any . . . tangible outcomes or any progress towards any outcome." (Id.) Jennings complained that when asked about the Project, Plaintiff discussed the Project on a high-level perspective but did not demonstrate he was working through the details to deliver tangible results. (Jennings Decl. at 9). Jennings testified he then reached out to his human resources contact, an African-American woman named Kim Reynolds ("Reynolds"), to seek advice on managing Plaintiff's employment. (Jennings Dep. at 149). Jennings testified he subsequently met with Plaintiff in August 2014 to discuss concerns and explain Defendant's expectations for the Project. (Id. at 123). Plaintiff acknowledged that Jennings informed him during the meeting that Plaintiff's approach was too "hands off," and Plaintiff needed to be more directly involved in his projects. (Pulliam Dep. 98-99).

Plaintiff, meanwhile, claims one of the issues causing the Project delay included a lack of sponsorship. Sponsors are high-level executives who advocate for a project internally and provide project oversight and guidance. While sponsorship is helpful for ensuring a project has the necessary resources needed for completion and managing resistance within the corporation, sponsors are not responsible for ultimately developing a project. (Jones Decl. at 3). Further, Plaintiff's alleged sponsorship challenges lack evidentiary support, as Plaintiff acknowledged he ultimately had two sponsors, Jay Rabello and Mike Jones, sponsoring and supporting the Project. (Pulliam Dep. at 71-72).

3

Plaintiff also claims Jennings treated him differently from the white employees. Plaintiff points to evidence that Jennings stated during a business meeting "nobody gives a damn who you know at Ebony," apparently referring to Ebony magazine, a magazine marketed to African-Americans. (Pulliam Dep. at 64). Plaintiff further complained that Jennings frequently went to lunch with white colleagues in his department, but Jennings never extended an invitation to Plaintiff. (Pulliam Decl. at 4). Lastly, Plaintiff argues Jennings once prevented Plaintiff from hiring his former colleague, Trae Fletcher, to join Plaintiff's team and instead let another director hire Fletcher who had a more "urgent need." (Pulliam Dep. at 51).

Jennings noted that by mid-October, he had not received any templates, forms, or tools for the Project, and when asked for more information, Plaintiff gave Jennings a "one-page schematic" copied from what another employee had previously written on a whiteboard. (Jennings Decl. at 10-11). Moreover, on October 24, 2014—well into Q4—Plaintiff sent Jennings an email informing him the Project is "still an initiative," despite the original timeline mandating the Project be established by Q3. (Jennings Dep. Ex. 20). After receiving similar negative feedback regarding Plaintiff from other vice presidents and directors who had worked with him, and after consultation with Reynolds, Jennings made the decision to terminate Plaintiff.

On November 3, 2014, Jennings terminated Plaintiff's employment for failing to meet expectations. (Pulliam Dep. at 39; Jennings Dep. at 227). Jennings testified that although he consulted with Reynolds first, it was Jennings' decision to terminate Plaintiff. (Jennings Decl. at 12). Plaintiff's employment had lasted less than seven months, from April 7 to November 3, 2014. Plaintiff's position was never filled after his termination, and the position was ultimately removed from Defendant's management structure.

4

Plaintiff initiated this action by filing a complaint on November 22, 2017, in the Superior Court of North Carolina at Mecklenburg County, and Defendant removed the case to this Court on January 4, 2018. Defendant moved for summary judgment on October 5, 2018. (Doc. No. 13). A hearing was held to resolve the summary judgment motion on December 5, 2018, at which all parties were represented by counsel, and the Court issued an oral order granting Defendant's motion and advised the parties of this forthcoming Order.

## II. APPLICABLE STANDARD

### A. Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, granting of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When making this assessment, facts must be viewed in "light most favorable to the non-moving party," and the Court "must draw all reasonable inferences in favor of the non-movant." Hensley v. Suttles, 167 F. Supp. 3d 753, 758 (W.D.N.C. 2016), aff'd, 876 F.3d 573 (4th Cir. 2017). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979). Moreover, a party disputing a fact must support its assertions through citations to specific areas in the record, and this support must be comprised of admissible evidence. Fed. R. Civ. P. 56(c)(1-2).

If the movant establishes no genuine dispute of material fact, the burden then shifts to the non-moving party. Temkin v. Frederick Cty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). The nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348,

1356, 89 L. Ed. 2d 538 (1986) (citations omitted). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id. at 255.

### B. Law Applicable to Plaintiff's Claims

Plaintiff alleges his termination of employment with Defendant resulted from discriminatory bias. This Order addresses Plaintiff's two claims: (1) race discrimination in violation of 42 U.S.C. § 1981; and (2) wrongful termination in violation of public policy under N.C. Gen. Stat. § 143-422.2. These claims are both analyzed using the same evidentiary standard as claims under Title VII. See Guessous v. Fairview Property Investments, LLC, 828 F.3d 208, 216 (4th Cir. 2016) (applying the Title VII proof structure to § 1981 claims); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995) (applying the Title VII proof structure to state claims in violation of public policy under N.C. Gen. Stat. § 143-422.2). Therefore, the Court's subsequent analysis will apply to both claims.

To establish discrimination, a plaintiff may prove violations either through direct evidence of retaliatory animus or through the burden-shifting framework of McDonnell Douglas Corp. v. Green. Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Having no direct evidence of discriminatory animus here, Plaintiff proceeded under the burden-shifting framework of McDonnell Douglas. The McDonnell Douglas burden-shifting framework requires three steps:

6

(1) the plaintiff must establish a prima facie case of discrimination, then (2) the employer bears the burden of production "to articulate a non-discriminatory . . . reason for the adverse action," and finally (3) "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory." Guessous, 828 F.3d at 216. However, the ultimate burden of showing the employer intentionally discriminated against him remains at all times with the plaintiff. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981).

Establishment of a prima facie case of discrimination is a critical component of the McDonnell Douglas proof structure because it "eliminates the most common non-discriminatory reasons for the plaintiff's rejection" and thus gives rise to an "inference of discrimination." Texas Dep't of Cmty. Affairs, 450 U.S. at 254, 101 S. Ct. at 1094 (citations omitted). A plaintiff alleging discriminatory discharge must establish his prima facie case by showing "(1) [he] is a member of a protected class; (2) [he] suffered from an adverse employment action; (3) [he] was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class." Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005) (citations committed).

### III.   ANALYSIS

This Court will not delve into whether or not Plaintiff has satisfied his prima facie case because, here, the pretext stage of the analysis is dispositive. This case hinges on the fact that Jennings was primarily responsible for hiring, supervising, and finally terminating Plaintiff's

7

employment within a seven-month period, raising the Proud v. Stone same-actor inference of non-discrimination. 945 F.2d 796, 798 (4th Cir. 1991).

Assuming *arguendo* that Plaintiff has established a prima facie case of discrimination, Plaintiff fails to point to any evidence showing Defendant's stated legitimate nondiscriminatory reason for termination was pretextual. During the pretext stage of the McDonnell Douglas analysis, courts consider evidence of the "same actor" or Proud inference of nondiscrimination. Proud, 945 F.2d at 798 ("The relevance of the fact that the employee was hired and fired by the same person within a relatively short time span comes at the third stage of the analysis"). A Proud inference instructs a court that where "the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring," there is a "strong inference" that the employer's action was not motivated by discrimination. Proud, 945 F.2d at 798; see also Coleman v. Loudoun Cty. Sch. Bd., 294 F. App'x 778, 783 (4th Cir. 2008) (unpublished) (applying the same inference in cases of racial discrimination). This is because "if discrimination actually motivated the adverse employment action, the same discrimination most likely would have also affected the employer's original decision to hire the plaintiff." Adams v. Greenbrier Oldsmobile/GMC/ Volkswagen, Inc., 172 F.3d 43 (4th Cir. 1999) (unpublished).

Here, there exists a Proud inference of nondiscrimination because Plaintiff was hired and fired by the same individual, Jennings. Jennings has presented unrebutted evidence that he spearheaded the interview process for the Measure & Evaluate Director position, and he had final authority over whether to hire Plaintiff. (Jennings Decl. at 4-5; Jennings Dep. at 49). Jennings testified other individuals also interviewed and rated Plaintiff; however, it was ultimately Jennings' decision whether or not to hire the incoming director. (Jennings Dep. at 49). It was also Jennings'

decision to terminate Plaintiff for poor performance on November 3, 2014. (Jennings Decl. at 12) ("Ultimately, it was my decision to terminate Pulliam."). While Plaintiff calls attention to Jennings' consultation with Reynolds before the termination, the record indicates Reynolds simply served as a sounding board, helping Jennings to more fully understand his options. (Jennings Dep. at 225-26) ("[Reynolds] said there's — there's two options you have and … I support[] termination, if that's what you want to do."). The record does not indicate Reynolds had the authority to override a decision by Jennings to terminate Plaintiff. Additionally, Plaintiff's employment with Defendant lasted a mere seven months, which is well within the requirements necessary for the Proud inference. See Smyth-Riding v. Sciences and Eng'g Servs. LLC, 699 Fed.Appx. 146, 158 (4th Cir. 2017) (unpublished) (rejecting plaintiff's argument that twenty-month employment was too long to apply a Proud inference).

Even if Reynolds was also a decisionmaker in Plaintiff's termination, this would further support a strong inference of nondiscrimination because Reynolds is also African-American. Several courts have acknowledged the common-sense notion that when a decisionmaker is in the same protected class as the plaintiff, this weakens any inference of discrimination. See Orgain v. City of Salisbury, 305 F. App'x 90, 103 (4th Cir. 2008) (unpublished) (finding "no fair-minded jury could find that race played any role" in voting to suspend the bar's liquor license because the Liquor Board Commissioner, Leo McNeil, was the same race as most of the customers at the bar); Rooks v. Girl Scouts of Chicago, 95 F.3d 1154 (7th Cir. 1996) ("[T]here can be no compelling inference of age discrimination because Ms. Wiseman herself is also in the protected age group."); Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 1002 (5th Cir. 1996) (DeMoss, J., concurring) (abrogated on other grounds) (reasoning "[w]hen decision makers are in the same protected class

as the discharged employee, it is . . . less likely that unlawful discrimination was the reason for the discharge."). In sum, the Proud inference of nondiscrimination remains intact in the Court's analysis here.

However, the inquiry does not end simply when the hirer and firer are the same individual. Proud explains in such situations, a plaintiff still has the "opportunity to present countervailing evidence of pretext." Proud, 945 F.2d at 798. For example, the Fourth Circuit held the Proud inference was rebutted when a plaintiff presented direct evidence of discrimination through derogatory comments. Compare Adams v. Greenbrier Oldsmobile/GMC/ Volkswagen, Inc., 172 F.3d 43 (4th Cir. 1999) (unpublished) (reversing the district court's judgment in part and holding the Proud inference disappeared when the employer "specifically identifi[ed] Adam's disability as the reason for the challenged termination"); with Tyndall v. Nat'l Educ. Centers, Inc. of California, 31 F.3d 209, 215 (4th Cir. 1994) (finding the plaintiff's proffered evidence of "unexceptional remarks regarding Tyndall's work performance and general welfare" were insufficient to rebut the Proud inference of non-discrimination). Therefore overall, courts have characterized the necessary level of evidence to counter a Proud inference as "egregious." Brice v. Joule Inc., 229 F.3d 1141 (4th Cir. 2000); Proud, 945 F.2d 796, 798.

Consequently here, Plaintiff has not presented or even forecast any "egregious" evidence, which is necessary to combat the strong inference that discrimination was not the cause of termination. Plaintiff's allegations of discrimination focus on an isolated comment and his characterization of friction with Jennings over the months preceding his firing. Notably, this evidence is also consistent with Defendant's stated legitimate nondiscriminatory reason for termination: that Plaintiff did not timely complete the Project. Jennings' Ebony magazine offhand

comment that "nobody gives a damn who you know at Ebony" does not rise to the level of direct evidence of discrimination or even overt racial slurs. Defendant argues Jennings' comment can be construed as simply chastising Plaintiff for "name dropping," an attribute Jennings claimed Plaintiff was known for. (Jennings Dep. at 152, 161). See Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 65 (1st Cir. 2002) ("This circuit has made clear that inherently ambiguous statements do not qualify as direct evidence."). Moreover, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discrim[ination]." Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) (considering a sexually objectionable environment in a case of sex discrimination); see also Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 285 (4th Cir. 2015) (applying the same analysis to incidents of racial discrimination).

Plaintiff argues Jennings frequently invited white colleagues to coffee or lunch and not Plaintiff; however, this is far from "egregious" evidence of discrimination. The evidence suggests Jennings and Plaintiff were not friends. See Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989) ("What appellant's assertions did prove was that she and Neuman did not like each other. . . . personality conflict generated antipathy and professional incompatibility . . . [b]ut this certainly does not translate into discrimination. An employer is not required to like his employees.") (citations omitted); Christoforou v. Ryder Truck Rental, Inc., 668 F. Supp. 294, 303 (S.D.N.Y. 1987) ("The law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or unfortunately, even to behave reasonably and justly when he is peeved.").

11

Plaintiff's remaining alleged instances of discrimination similarly are insufficient to rebut the strong inference of nondiscrimination mandated by Proud. Plaintiff complains that when he was about to hire Trae Fletcher to work on his team, someone whom he had previously worked with, Jennings instead hired Fletcher for another team, because that team had a more "urgent need." (Pulliam Dep. at 51). Nothing about this assertion, even if proven true, gives rise to an inference of discrimination. Such evidence is therefore insufficient to survive Defendant's summary judgment motion. See Bongam v. Action Toyota, Inc., 14 F. App'x 275, 281 (4th Cir. 2001) (unpublished) (finding that speculative testimony by the plaintiff was insufficient to withstand a motion for summary judgment); Brewer v. Dana Corp. Spicer Heavy Axle Div., 205 F. Supp. 2d 511, 520 (W.D.N.C. 2002) ("Speculative assertions that defendants' motivation was racial is not enough to withstand summary judgment").

Lastly, Plaintiff identifies an email from Mr. Ross stating Reynolds agreed the termination was "more about fit than performance." (Decl. of Finlon, Ex. E). This isolated comment, in combination with Plaintiff's other assertions, still does not rise to the level of discriminatory evidence necessary to combat the "strong inference" of discrimination mandated by Proud. Brice, 229 F.3d 1141 (4th Cir. 2000); Proud, 945 F.2d 796, 798. Nor do the facts in this case in any way mirror the direct evidence found sufficient to rebut the Proud inference in Adams. Adams, 172 F.3d at *6 (4th Cir. 1999) (holding the Proud inference disappeared because Plaintiff identified direct evidence of discrimination when the employer "specifically identifi[ed] Adam's disability as the reason for the challenged termination").

## IV. CONCLUSION

Here, the evidence before the Court is "so one-sided" that Defendant "must prevail as a matter of law." See Anderson, 447 U.S. at 248. Accordingly, the Court concludes Defendant is entitled to summary judgment on Plaintiff's claim for race discrimination under § 1981. For the same reasons, summary judgment is also proper for Plaintiff's state law claims for wrongful discharge in violation of North Carolina public policy. See Jones v. Jack Henry & Associates, Inc., No. 3:06CV428, 2007 WL 4226083, at *4 (W.D.N.C. Nov. 30, 2007) (dismissing the Plaintiff's wrongful discharge in violation of public policy claim after determining Plaintiff's Title VII and § 1981 claims must be dismissed).

As set forth in the Court's previous oral order, Defendant's Motion for Summary Judgment (Doc. No. 13) is hereby GRANTED.

IT IS SO ORDERED.

Signed: February 15, 2019

Frank D. Whitney
Chief United States District Judge